POLLY OLSEN

            Plaintiff,

   v.                                     Case No.  18-cv-1366

NORTHEAST WISCONSIN TECHNICAL COLLEGE, et al.

            Defendants.

## PLAINTIFF, POLLY OLSEN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## <u>INTRODUCTION</u>

On Valentine's Day 2018, Polly Olsen handed out approximately thirty home-made, religiously-themed Valentines at various locations within the complex of interconnected buildings on the campus of her college, Northeast Wisconsin Technical College ("NWTC"). After an unknown person complained to the school's Security Department, the college mobilized and an officer was dispatched to stop Ms. Olsen and bring her to the school's Security Office. Ms. Olsen was told that her speech violated the school's Public Assembly Policy. She was told that her conduct constituted solicitation, was disruptive and that the religious messages on the Valentines (such as "Jesus Loves You") could be offensive to some people.

NWTC's actions were not only silly, they were unconstitutional. Ms. Olsen's conduct is protected by the First Amendment. She filed this civil rights action under 42 U.S.C. § 1983 to vindicate her First Amendment rights.[1]

---

[1] Ms. Olsen understands that the disputes in this case center around whether or not there has been a First Amendment violation and not whether, if she establishes a First Amendment violation, she can meet the elements of her claim under § 1983. Thus, this brief focuses on the First Amendment violations and not the elements of a § 1983 claim.

Case 1:18-cv-01366-WCG   Filed 02/12/19   Page 1 of 30   Document 12

## **FACTUAL BACKGROUND**

*The Plaintiff*

Polly Olsen is a student at NWTC. (Plaintiff's Proposed Findings of Fact ("PPFF") ¶1.) She is a Christian. (PPFF ¶2.) Early in her life, she and her mother began making religiously-themed Valentines and handing them out on Valentine's Day to friends, acquaintances, and strangers in a variety of places, including nursing homes, hospitals, and the neighborhood in which they lived. (*Id.* ¶3.) They thought of this as an attempt to spread Christian love and fellowship on Valentine's Day.[2] (*Id.* ¶4.) Ms. Olsen's mother died in 2013 and Ms. Olsen has carried on her mother's tradition by continuing to make and pass out religiously-themed Valentines on Valentine's Day. (*Id.* ¶¶5-6.)[3]

*The Defendants*

Pursuant to Wis. Stat. § 38.01, Defendant NWTC District Board is in charge of the technical college in the northeast district – namely NWTC – and pursuant to Wis. Stat. § 38.14 may sue and be sued in the name of the district. (PPFF ¶¶10-11.) The NWTC District is one of sixteen technical college districts in Wisconsin. (*Id.* ¶12.) The District Board has exclusive control over the policy-making operations that govern the District. (*Id.*)

Defendants H. Jeffrey Rafn and Colleen Simpson are, respectively, President and Vice President of Student Services of NWTC. (PPFF ¶13.) Defendant Randy Schultz is Security Coordinator. (*Id.* ¶14.) Defendant Mike Jandrin is Security Supervisor. (*Id.* ¶15.) Defendant

---

[2] It is worth noting that the holiday is actually "St. Valentine's Day." St. Valentine is considered the patron saint of love.

[3] Ms. Olsen made the Valentines she passed out in 2018 by hand. (PPFF ¶7.) The Valentines are red, heart-shaped, approximately three inches by three inches in diameter and bear a variety of encouraging Christian messages such as "Jesus Loves You" and "You Are Loved" along with Bible references related to the notion that we are all loved. (*Id.* at ¶8.)

2

Jesse Hagel is a former Security Officer at NWTC. (*Id.* ¶16.) The remaining individual Defendants are members of the District Board of NWTC. (*Id.* ¶17.) Unless otherwise indicated or clear from the context, all of the Defendants shall be referred to collectively as "NWTC."

*The Events of February 14, 2018.*

On the morning of February 14, 2018, Ms. Olsen handed out Valentines in several areas of the NWTC Green Bay campus. (PPFF ¶18.) In particular, she entered the College of Business building (which is part of the interconnected set of buildings that make up a large part of the campus) and handed out Valentines to several individuals she encountered in the entrance area and nearby hallways. (*Id.*) She then went to the offices of the College of Business, where she gave Valentines to a few individuals including the receptionist. (*Id.* ¶19.) There were no signs of any sort stating that these areas were not open to students or that students needed permission to access any areas. (*Id.* ¶20.) Nor did anyone in the office complain about Ms. Olsen handing out Valentines or refuse the Valentines she offered. (*Id.*)

Ms. Olsen then walked to an area known as "The Buzz," a coffee shop across from the College of Business offices. (PPFF ¶21.) This is an area where students freely congregate to socialize and grab a cup of coffee. (*Id.*) Ms. Olsen handed out Valentines to a few students in The Buzz. (*Id.*)

Ms. Olsen then proceeded to the office of her friend, AJ Reed, who is located in the Academic Skills office, and handed him a Valentine. (PPFF ¶22.) Mr. Reed told Ms. Olsen that his wife Casandra ("Cassie") – also a friend of Ms. Olsen's – was in her office in the General Studies Office. (*Id.*) Ms. Olsen left to give Cassie a Valentine. (*Id.*)

On her way to the General Studies Office, Ms. Olsen handed Valentines to two individuals sitting at tables in the hallway outside that office who appeared to be packing up their materials.

3

(PPFF ¶23.) She then went into the General Studies Office, walked to the reception desk, and handed Valentines to three people sitting behind the desk. (*Id*. ¶24.) She asked the receptionist if Angela Blasier (who she knew personally) was in her office. (*Id*.) She was told that Angela was not in. (*Id*.) She told the receptionist that she was going to leave a Valentine on Angela's desk and give one to Cassie. (*Id*.) The receptionist told Ms. Olsen that she thought this was a very nice gesture. (*Id*.) None of the three individuals behind the reception desk said or did anything to indicate that she was not permitted to proceed to their offices or to any other individual offices within General Studies or objected to her doing so. (*Id*.) Ms. Olsen then walked to Angela's and Cassie's offices. (*Id*. ¶25.) On the way she handed Valentines to four people who were congregating and socializing in the reception area. (*Id*.) These people were discussing issues unrelated to school business. (*Id*.)

Angela's office is a room with a door, whereas Cassie's office is one of several cubicles in the area. (PPFF ¶26.) Because Angela was not in her office, Ms. Olsen simply dropped a Valentine on her desk, which was within reach of the doorway. (*Id.*) Nearby is a second office with a door which Ms. Olsen had visited in the past for business reasons and which was unoccupied at the time. (*Id.*) Ms. Olsen does not recall if she dropped a Valentine on the desk in that office, but she may have done so. (*Id.*) Cassie was in her cubicle, and Ms. Olsen handed her a Valentine. (*Id.* ¶27.) She was welcomed by Cassie and estimates that she was in her immediate office area for about 10-15 seconds. (*Id.*) She also dropped off Valentines in the cubicles of a few other individuals. (*Id.*) Ms. Olsen dropped off these Valentines in view of school employees in the area and even narrated what she was doing as she did it. (*Id.* ¶28.)

Ms. Olsen's visits to Angela and Cassie's offices were consistent with her previous practice of visiting employees at NWTC who are friends for both personal and school-related reasons.

4

(PPFF ¶30.) She had freely walked through the General Studies Office and had seen numerous other students do the same thing. (*Id.*) She understood based on past experience and general practice at NWTC that she was permitted to visit the area without an appointment or advance announcement. (*Id.*)

An NWTC security camera recorded Ms. Olsen's activities in and around the General Studies Offices. A link to the video is here.[4] (PPFF ¶34.) The video shows Ms. Olsen in the area of the General Studies Offices for approximately one minute between 10:24:10 a.m. and 10:24:54 a.m. (*Id.* ¶35.) It does not show her leaving the area because she left through the back door. (*Id.* ¶36.) She estimates that she was in the General Studies Office for 20-30 seconds longer than what the security video shows. (*Id.*)

According to NWTC's security records, shortly after Ms. Olsen left the area of the General Studies Offices, someone phoned the NWTC Security Office to complain. (PPFF ¶37) According to security personnel, the complaint was that a female student was in the General Studies Office and was "passing out Valentine's Day cards with bible references on the cards." (*Id.*)

After leaving the General Studies Office Ms. Olsen continued to hand out Valentines until she was stopped by NWTC Security Officer Jesse Hagel. (PPFF ¶40.) After stopping her, Officer Hagel told Ms. Olsen that her conduct constituted "solicitation" and that it was in violation of the Public Assembly Policy. (*Id.* ¶41.) Ms. Olsen was further told that she was prohibited from handing out Valentines. (*Id.*) Officer Hagel then took her to the Security Office where she stayed for approximately one hour. (*Id.* ¶45.)

---

[4] In response to Plaintiff's discovery requests NWTC produced a copy of that video as an mp4 file which is attached to the Declaration of Anthony LoCoco as Exhibit C. (PPFF ¶34.) Ms. Olsen also authenticates the video by testifying that the video fairly and accurately portrays her activities in the area of the General Studies Office. (*Id.* ¶36.)

At the Security Office Ms. Olsen was met by Officer Hagel's supervisor, Security Supervisor Michael Jandrin. (PPFF ¶46.) Jandrin told her that "some people may consider her actions soliciting, or find the message written on the card offensive." (*Id*.) According to NWTC records, Ms. Olsen was also told she was potentially "disturbing the learning environment, and walking into an area that is restricted to students without being invited or announced." (*Id*. ¶47.) Ms. Olsen told Jandrin that NWTC was violating her right to free speech and discriminating against her based on her religious beliefs. (*Id*. ¶51.)

*Follow-Up Correspondence*

Ms. Olsen filed a complaint with the college. (PPFF ¶52.) As she had informed Supervisor Jandrin, she believed that NWTC had infringed her First Amendment rights. (*Id*. ¶¶51-52.) Following a meeting to discuss her complaint, Ms. Olsen's counsel sent NWTC a letter dated March 22, 2018, fully setting forth the facts and her legal position regarding the violation of her First Amendment rights. (*Id*. ¶54.) The letter made clear that the Public Assembly Policy was facially unconstitutional and was unconstitutional as applied to her specific expressive activity. (*Id*.) After a substantial delay, on May 10, 2018, NWTC's counsel responded stating that NWTC's Public Assembly Policy was constitutional and that "NWTC's enforcement of the policy on February 14, 2018 with regard to your client, Polly Olsen, was lawful." (*Id*. ¶55.) The letter specifically states: "It is clear that NWTC's Public Assembly Policy does not violate the First Amendment. It follows, then that NWTC's simple refusal to allow Ms. Olson to conduct expressive activities inconsistent with the policy did not violate her constitutional rights." (*Id*.)

Consequently, this case raises two issues: (1) is NWTC's Public Assembly Policy facially constitutional; and (2) can NWTC constitutionally prohibit Ms. Olsen from handing out religiously-themed Valentines on campus?

NWTC has adopted and promulgated a "Public Assembly Policy" that regulates freedom of speech and expression on campus. (PPFF ¶58.)  The Policy requires each campus and regional learning center to "designate space assigned as a limited public forum referred to as the Public Assembly Area."  (*Id.* ¶59.)  Speech on campus is highly regulated both within and outside the Public Assembly Area.  "Literature" cannot be distributed outside the Public Assembly Area and no one can attempt to engage in "activities with the intent to convey a message to a broad audience" outside the Public Assembly Area.  (*Id.*)  Access and use of the Public Assembly Area requires prior permission from NWTC through an advance reservation. (*Id.*)

The Public Assembly Area on the Green Bay campus is a tiny area located outside one of the 15 entrances to NWTC's main group of interconnected buildings (Entrance #6).  (PPFF ¶63[5])  While the Green Bay campus consists of 145 acres and has 1.073 million square feet of building space, the Public Assembly Area consists of only 480 square feet.  (*Id.* ¶64.)  It thus constitutes 0.0076% of the campus area.  (*Id.*)  None of the entire 1.073 million square feet of enclosed building space is part of the Public Assembly Area.  (*Id.*)

According to NWTC, Ms. Olsen's expressive activity (handing out religiously-themed Valentines on Valentine's Day) violated the Policy.  The Policy provides, in relevant part:

All activities must comply with the following:

1. Any acts that are disruptive to the normal operations of the College including but not limited to classes and College business or violates the rights of others will not be tolerated. . . .

3. Picketing or displaying signs in an orderly manner or mass distribution of literature within the public assembly area is acceptable with the appropriate *request to reserve* . . . . Literature, petitions, and requests for registrations may be

---

[5] NWTC's response to Interrogatory No. 3 says that the Public Assembly Area is "outside of the Main Entrance and Student Center entrance."  (PPFF ¶63.)  The NWTC map shows that this is one of the 15 entrances to the NWTC set of interconnected buildings.  (*Id.*)

distributed in the public assembly area only, except those with other designations initiated by College personnel and approved by [the] president or his/her designee. . . .

4. . . . [M]ass distribution of literature with offensive content or that is likely to or intended to cause a disruption will not be permitted. Soliciting petitions or other attempts such as through excessive noise to protest, demonstrate or engage in other types of activities with the intent to convey a message to a broad audience of people on College grounds outside of the public assembly area, will not be permitted.

(PPFF ¶61.)

The Policy does not define "literature," "soliciting," "disruptive," "mass distribution," or "offensive content."

*Ms. Olsen's Claims*

Ms. Olsen has alleged five distinct claims challenging NWTC's Public Assembly Policy. Claim I is a facial challenge to the Policy alleging that the Policy unconstitutionally limits speech and expressive conduct to the Public Assembly Area, a tiny sliver of campus. Claim II is a facial challenge to the Policy alleging that the Policy represents an unconstitutional prior restraint containing unconstitutionally broad and vague standards for approval. Claim III is a facial challenge to the Policy alleging that the Policy's lack of definitions for important terms like "literature," "soliciting," "disruptive," "mass distribution," and "offensive content" renders the Policy unconstitutionally overbroad and vague. Claim IV is an as-applied challenge to the Policy alleging that, even if the Policy is facially constitutional, NWTC violated Ms. Olsen's First Amendment rights when it applied it to her conduct. Claim V alleges that Defendants Jandrin and Hagel violated Ms. Olsen's First Amendment rights by unconstitutionally restricting her speech and expression based on its religious content.

**ARGUMENT**

The First Amendment to the United States Constitution provides in part that "Congress

shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to the States through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652 (1925), and is fully binding on state colleges like NWTC. *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("[O]ur cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities.")

## I. THE PUBLIC ASSEMBLY POLICY'S LIMITATION OF STUDENT SPEECH TO A SINGLE, TINY AREA OF CAMPUS IS UNCONSTITUTIONAL (CLAIM I)

When the government limits speech on its own property, courts generally evaluate the constitutionality of such restrictions using a "'forum based approach,'" *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), which focuses on "the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). While the terminology is not always consistent, the Supreme Court's cases recognize three types of government-controlled spaces: (1) traditional public forums, (2) designated public forums, and (3) limited or nonpublic forums. *Minnesota Voters All. v. Mansky*, ___ U.S. ___, 138 S. Ct. 1876, 1885 (2018).

The government's ability to regulate speech on government property turns upon which kind of space is involved. *Id.* With respect to the first two categories, "the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* The "reasonable time, place, and manner restrictions must be "narrowly tailored to serve a significant governmental interest," and must "leave open ample alternative channels for communication of the information." *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The government has more leeway in the third category – nonpublic forums – but even there the government does not have free reign. *Minnesota Voters*, 138 S. Ct. at 1885. It "may reserve

such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry*, 460 U.S. at 46).[6] Given this analytical framework, this Court should first determine the nature of the NWTC campus.

### A. The Relevant Parts of NWTC's Campus Are Either a Traditional or a Designated Public Forum.

"A traditional public forum is public property that 'by long tradition or by government fiat . . . has been devoted to assembly and debate,' such as a public street or square." *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 864 (7th Cir. 2008) (quoting *Perry*, 460 U.S. at 45). In *Minnesota Voters,* 138 S. Ct. at 1885, the Supreme Court described traditional public forums as "parks, streets, sidewalks, and the like."

Courts have recognized that areas of college campuses that are analogous to a public street or sidewalk, or a public park or public square should be treated as traditional public forums. For example, in *Students against Apartheid Coal. v. O'Neil*, 660 F. Supp. 333, 338 (W.D. Va. 1987), the court held that the central lawn of a university was akin to a municipal park and would be characterized as a traditional public forum. Similarly, in *McGlone v. Bell,* 681 F.3d 718, 733 (6th Cir. 2012), the court held that the sidewalks around a campus are so similar to city sidewalks that they are traditional public forums.

In fact, even more broadly, a college campus is like a "town" for the students that attend that school. In that regard, the Supreme Court has observed that "a university campus, at least as to its students, possesses many of the characteristics of a traditional public forum." *Cornelius v.*

---

[6] The Court also sometimes refers to "limited public forums," which "exist[] where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, ___ U.S. ___, 135 S. Ct. 2239, 2250 (2015) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)) (alteration in original). Limited public forums are treated like nonpublic forums. *See, e.g., Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009).

*NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 803 (1985). The areas of NWTC's campus where students walk from place to place,[7] congregate for social activities, recreate and freely communicate with one another are all traditional public forums. They are the sidewalks, parks and town square for the students. *See also Shaw v. Burke*, No. 2:17-CV-02386-ODW (PLAx), 2018 WL 459661, at *8 (C.D. Cal. Jan. 17, 2018) (order granting in part and denying in part motion to dismiss) (concluding that "[g]iven the traditional purpose of the open, outdoor areas of universities, such as the "Mall" on [a community college's] campus, the Court finds that these areas are traditional public fora, regardless of [the college's] regulations naming them non-public fora," and rejecting the argument "that there should be some distinction" between community colleges and public universities).

And even if some other areas of the NWTC campus are not considered to be traditional public forums, many of them should be characterized as designated public forums – areas which the government has "intentionally opened up for that purpose." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). In determining whether an area is a designated public forum the Supreme Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum and has also examined the nature of the property and its compatibility with expressive activity. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

There are a number of such areas at NWTC. For example, the campus contains an outdoor courtyard where students assemble to eat meals and converse; this outdoor area is also used for school and club events which involve large assemblies of students and staff, speakers, and distribution of literature. (*See* PPFF ¶68.) The NWTC campus also contains an area known as the

---

[7] This would include the interior hallways that connect the various buildings at NWTC, which serve the same function as an outdoor sidewalk but allow protection from the climate during the winter.

Case 1:18-cv-01366-WCG   Filed 02/12/19   Page 11 of 30   Document 12

"back patio" located outdoors and between NWTC buildings. (*Id.* ¶69.) The NWTC Global Connections Club recently held a "Holi Festival" – an event involving significant expressive activity – at this location. (*Id.*)

The NWTC campus also has an area inside the Student Center known as the "Commons." (PPFF ¶70.) Students frequently congregate in this area for social purposes. (*Id.*) Further, NWTC holds an "involvement fair" in the Commons ever semester during which up to fifty student clubs set up tables to talk to students and distribute literature regarding their clubs. (*Id.*) NWTC also hosts regular career fairs which are held in the Commons and at which numerous employers set up displays, meet with students, and hand out literature regarding the businesses they represent. (*Id.*)

In fact, the entire Student Center is an area where students congregate outside of classes and where the college provides a variety of services to the students. (PPFF ¶71.) Based on Ms. Olsen's experience, the Student Center is full of everyday discussion and debate between students. (*Id.*) Whether these areas are considered traditional public forums or areas that have become designated forums because of their use for expressive activity, any regulations of speech in such areas must be content neutral, narrowly tailored to serve a significant governmental interest, and must leave open ample alternative channels for communication. *Clark*, 468 U.S. at 293; *Minnesota Voters*, 138 S. Ct. at 1885.

NWTC disagrees, contending that the entire NWTC campus is a non-public forum except for the 480 square foot Public Assembly Area which NWTC says is a designated public forum. (PPFF ¶73.) Thus, NWTC contends that it can regulate – and even forbid – speech on most of the campus. According to NWTC, its policy must be reasonable in time, place and manner only in the Public Assembly Area.

But First Amendment jurisprudence is to the contrary. In rejecting the exact argument

made by NWTC here, the court in *Univ. of Cincinnati Chapter of Young Americans for Liberty v. Williams* said that:

> Such a theory is an anathema to the nature of a university, which is "peculiarly the marketplace of ideas" and runs contrary to the Supreme Court's holding that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."

No. 1:12-CV-155, 2012 WL 2160969, at *5 (S.D. Ohio June 12, 2012) (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)); *see also Shaw*, 2018 WL 459661, at *8. NWTC argues that its campus is different from that of other colleges and universities because its campus is allegedly "compact and continuous and primarily consist of educational facilities and parking lots (and in the case of the main Green Bay campus, connective walkways." (PPFF ¶56.) The court in *Shaw* rejected a similar argument that public universities and community colleges were distinguishable for First Amendment purposes. *Shaw*, 2018 WL 459661, at *8. Regardless, discovery has shown that the Green Bay campus consists of **145 acres** and has **1.073 million square feet of building space**. (PPFF ¶64.) The campus is neither cramped nor confined and as described above has numerous open areas which are appropriate for speech and which have been used for student speech in the past. By virtue of the frequent use of such areas by students and staff and the robust variety of expressive conduct allowed (and encouraged) in these areas, NWTC has, by practice and intent, established these areas as designated public forums.

NWTC's Public Assembly Policy cannot transform NWTC's entire campus into a nonpublic forum. It would be "circular [reasoning]" to argue that because NWTC's "policy place[s] a limitation on the forum . . . the limitation on the forum in turn justifie[s] the policy." *OSU Student All. v. Ray*, 699 F.3d 1053, 1063 (9th Cir. 2012). Instead, "[t]o destroy the designation of a public forum, the government must do more. It must consistently apply a policy specifically designed to maintain a forum as non-public." *Id.* at 1063. This NWTC has not done.

13

Instead, the evidence in the record shows that NWTC treats much of its campus as a public forum for its students.

### B. The Public Assembly Policy Is Not a Reasonable Time, Place, or Manner Restriction because the Public Assembly Area is Simply Too Small.

NWTC's Public Assembly Policy essentially declares all but 0.0076% of campus to be a "non-public forum" off limits to free expression. This is unconstitutional on two grounds. First, assuming that NWTC's mission of educating its students is a significant governmental interest, the Policy is not "narrowly tailored" to the attainment of that end. As discussed above, expressive activity can and does occur on NWTC's campus without disrupting the learning environment. Even if NWTC believes that less speech on campus would promote more learning (a debatable pedagogical proposition), it must still adopt a more reasonably tailored policy that restricts speech in specific areas at specific times.

Second, NWTC's policy does not leave open "ample alternative channels for communication." The single alternative left open—the Public Assembly Area—is not adequate. "[A]n alternative is not adequate if it 'foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups.'" *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Further, "[t]he mere existence of an alternative method of communication cannot be the end of the analysis"; courts also consider whether "the intended message is rendered useless or is seriously burdened." *Id.* Students obviously need to engage in expressive activity beyond the confines of a miniscule slice of campus, such as in areas of high traffic, in campus buildings, and in common areas. Forcing students to refrain from expressive activity until they have arrived at a single, tiny "free speech zone" where others may not even be traveling constitutes a serious burden on their ability to engage in public debate and discourse.

The First Amendment mandates broader protection for speech on public campuses than that. *See, e.g. University of Cincinnati Young Americans for Liberty v. Williams*, No. 1:12-CV-155, 2012 WL 2160969 (S.D. Ohio 2012) (striking down university policy which required prior notice for "demonstrations, picketing, and rallies" and restricted them to a limited area on campus); *Khademi v. South Orange County Community College Dist.*, 194 F. Supp. 2d 1011 (C.D. Cal. 2002) (striking down policy declaring vast areas of campus off-limits for leafletting).

## II.    THE PUBLIC ASSEMBLY POLICY REPRESENTS AN UNCONSTITUTIONAL PRIOR RESTRAINT CONTAINING UNCONSTITUTIONALLY BROAD AND VAGUE STANDARDS FOR APPROVAL (CLAIM II)

"A prior restraint exists when a law gives 'public officials the power to deny use of a forum in advance of actual expression.'" *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002) (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). They are "highly disfavored and presumed invalid." *Id.*

Prior restraints can take "two forms": "a procedure that places 'unbridled discretion in the hands of a government official' and might result in censorship," and "a licensing procedure that fails to place time limits within which a decision maker must issue the license." *Id.* at 1045 (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 220 (1990) (opinion of O'Connor, J.)).

NWTC's Public Assembly Policy is a prior restraint under either definition. Use of NWTC's Public Assembly Area requires a "request to reserve" which must be submitted to the NWTC Security Office. (PPFF ¶¶61-62.) The request form requires the name of the group or individual making the request as well as a description of the activity requested. (*Id.* ¶62.) The form contains no standards or guidelines by which NWTC reviews the request in considering whether to approve or deny it. (*Id.*) Nor does the Policy itself provide criteria by which the college shall review applications or grant permission to use the Public Assembly Area. When it comes to

15

restrictions on speech – where courts are particularly sensitive to the "chilling" impact of vague restrictions and opaque processes – this is problematic. *Cf., e.g. Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014) (explaining that "[v]ague or overbroad speech regulations carry an unacceptable risk that speakers will self-censor, so the First Amendment requires more vigorous judicial scrutiny" than in other contexts). "[T]he lack of specificity in the procedure and the amount of discretion vested in the official lends itself to manipulation by the [government]. We cannot presume that officials will act in good faith and follow standards not explicitly contained in the ordinance." *Weinberg*, 310 F.3d at 1046.

In discovery, Ms. Olsen asked NWTC to describe the process used by NWTC for the last two years for reviewing applications to reserve the Public Assembly Area. (PPFF ¶60.) In response, NWTC was not able to describe any process for reviewing such applications. (*Id.*) Moreover, the Policy contains no recourse for an applicant to appeal or otherwise contest an adverse decision. Thus, the Policy fails to provide "narrow, objective and definite standards," which are necessary components of a constitutional permit requirement. *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150 (1988).

Further, none of the "narrow exceptions" for prior restraints, *Green Valley Investments v. Winnebago Cty.*, 794 F.3d 864, 868 (7th Cir. 2015), apply here. No "'powerful overriding interest' such as national security, obscenity, or incitement to violence and overthrow of the government" exists. *Id.* (quoting *Stokes v. City of Madison*, 930 F.2d 1163, 1169 (7th Cir. 1991)). NWTC does not offer "procedural safeguards" such as "the imposition on the censor of the burden of instituting judicial proceedings; the limitation of the restraint to a brief period for the purpose of preserving the status quo pending judicial review; and the assurance of a prompt judicial determination." *Id.* (quoting *Southeastern Promotions, Ltd.*, 420 U.S. at 553). And the requirement of prior approval

16

is not a reasonable time, place or manner restriction, as it is imposed in all cases without limitation to circumstances in which prior approval or reservation is necessary. *See id.* at 869. Rather, it applies to any person or group, no matter how small, and without regard to whether the contemplated speech activity might interfere with other uses of the space or require the exclusion of other speakers. The Policy, in other words, provides NWTC with the unchecked ability to censor student speech.

The Western District of Wisconsin struck down a similar scheme requiring advance registration and approval of expressive conduct by small groups as overbroad and not narrowly tailored to serve a significant governmental interest. *See Kissick v. Huebsch*, 956 F. Supp. 2d 981 (W.D. Wis. 2013) (enjoining permit requirement in the Wisconsin State Capitol for events or demonstrations, even those involving only one person, because the permitting scheme was "not narrowly tailored to serve a significant governmental interest," and barring enforcement of the policy for events of 20 persons or less). NWTC's Policy similarly restricts expressive conduct, even by a single individual, quarantining it to a meager speech zone that requires advance reservation.

*Smith v. Tarrant County College District*, 670 F. Supp. 2d 534 (N.D. Tex. 2009) is also instructive. There the court enjoined enforcement of a free speech zone similar to the one NWTC has established based on its overbreadth. The court noted that the school

> has provided a free-speech zone at each of its campuses, regulated access to those zones through a permit system that contains no guidelines or standards for decision-making officials, and denies students access to traditional public forums, such as sidewalks, streets and park areas. Areas that are traditionally considered public forums do not lose this character merely due to the fact they are on a school campus.

*Id.* at 538; *see also University of Cincinnati Young Americans for Liberty v. Williams*, No. 1:12-CV-155, 2012 WL 2160969 (S.D. Ohio 2012) (striking down the university's policy which

required prior notice for "demonstrations, picketing, and rallies" and restricted them to a limited area on campus).

NWTC's policy is the same, restricting expression to a "free-speech zone" and implementing a permitting scheme that places complete discretion in the hands of NWTC officials. As such, the policy is an unconstitutional infringement on the First Amendment rights of Ms. Olsen and anyone else desiring to express themselves on the NWTC campus. For these reasons, the Court should strike down the Public Assembly Policy as an unconstitutional prior restraint.

## III. THE PUBLIC ASSEMBLY POLICY'S LACK OF DEFINITIONS AND CRITERIA FOR IMPORTANT TERMS RENDER THE POLICY UNCONSTITUTIONALLY OVERBROAD AND VAGUE (CLAIM III)

In an overbreadth challenge, "a statute is facially invalid if it prohibits a substantial amount of protected speech," both "in an absolute sense" and "relative to the statute's plainly legitimate sweep." *Id.* at 476 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). Further, showing that a law is overbroad because it prohibits a substantial amount of protected speech "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003).

Similarly, the "void-for-vagueness doctrine protects against the ills of a law that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (*quoting FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). But "[w]hether the argument is styled as overbreadth or vagueness, the central question . . . is whether the provisions at issue potentially reach a 'substantial' amount of protected speech." *Id.* at 479-480.

18

Here, the Policy is overbroad and vague in at least three major respects. In order to know whether Ms. Olsen's actions on February 14, 2018 (or other expressive activity by students), comported with the requirements of NWTC's Policy, a student would be required to answer at least three questions, none of which can be satisfactorily answered by the terms of the Policy: (1) what constitutes "literature" and "mass distribution of literature with offensive conduct"? (2) what constitutes "soliciting"? and (3) what constitutes "disruptive" conduct?

### A. What Constitutes "literature" and "mass distribution of literature with offensive content"?

The Policy states, "Literature, petitions, and requests for registrations may be distributed in the public assembly area only . . . ." (PPFF ¶61.) But the policy does not define "literature." Are Valentine's Day cards with religiously-themed messages (or business cards or party invitations or a Shakespearean sonnet) "literature"? The Policy does not answer the question because it does not define "literature." Handing out any of the above could be a violation of the Policy.

Another section of the Policy prohibits the "mass distribution of literature with offensive content" but the Policy is unclear about when the distribution of literature becomes "mass distribution" and what content is "offensive." Are 30 Valentines mass distribution? Are 25? 10? 3? Are Bible references "offensive content"? The Policy does not say, although NWTC security personnel apparently thought so.

In *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995) the court struck down Central Michigan University's discriminatory harassment policy on vagueness grounds, holding that the policy failed to provide fair notice of the standard of conduct to which university students and personnel shall be held. The same is true at NWTC. NWTC's Policy fails to provide students with discernable standards for determining what conduct is permitted and prohibited. It

certainly did not inform Ms. Olsen that NWTC considered handing out Valentines on Valentine's Day to be a violation of the policy.

The Policy is also overbroad. The Policy does not contain a *de minimis* exception. The Policy prohibits *any* distribution of literature outside the Public Assembly Area. Handing out a single piece of literature violates the Policy. It limits free speech to the Public Assembly Area, an area constituting only 0.0076% of campus and an area outside the campus buildings where students do not congregate. NWTC has set forth no rationale why such a sweeping prohibition of speech on its campus, particularly by its own students, serves NWTC's educational mission. This prohibition cannot possibly withstand the requirements for reasonable time, place, and manner restrictions required under *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288 (1984). *See also Bair v. Shippensburg University*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (striking down campus speech code that prohibited speech beyond that necessary to prevent substantial disruption or interference with school or its students); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 870 (N.D. Tex. 2004) (striking down university's general restriction on speech outside the designated "free speech" forum because it burdened more expressive activity than the university had a significant interest in regulating).

**B. What Constitutes "Soliciting" Such That It May Not Occur Outside the Prescribed Public Assembly Area?**

Ms. Olsen was told twice by NWTC Security that her conduct of handing out Valentines was "soliciting" and, thus, a violation of the Public Assembly Policy. (PPFF ¶¶41, 46.) But Ms. Olsen was not selling the Valentines and she did not ask for anything from the individuals to whom she handed them. (*Id.* ¶42.) In discovery, Ms. Olsen asked NWTC to admit that it had no evidence that she was soliciting but NWTC refused to do so. (*Id.* ¶43.)

But what part of the Policy does NWTC contend she was violating? The only time the

Policy uses the word "soliciting" is when it says that "Soliciting petitions … outside of the public assembly area, will not be permitted." (*Id.* ¶61.) How was Ms. Olsen supposed to know that handing out Valentines on Valentine's Day constituted "soliciting petitions"? Again, the policy is unconstitutionally vague and to the extent it prohibits handing out Valentines on Valentine's Day it is also unconstitutionally overbroad and serves to chill and restrict a wide variety of expressive conduct that would not be considered the type of "solicitation" that might be constitutionally restricted on college campuses.

## C. What Constitute "disruptive" Actions?

The Policy provides that "[a]ny acts that are disruptive to the normal operations of the College including but not limited to classes and College business or violates the rights of others will not be tolerated." (*Id.*) "Disruptive" is not defined in the policy.

Similar to the other sections discussed above, the Policy provides no means to determine when or how a person's actions might be deemed "disruptive." One might say that any attempt by college students to speak to one another or communicate ideas might be "disruptive" to those who do not wish to be spoken to. Even saying "Good morning" to someone could be disruptive. It could disrupt their train of thought or a comment they were about to make or even cause them to stop and enter into a conversation. On that view, public colleges and universities could impose a monastic silence.

If the concept of "disruption" is that capacious (and, as we shall see, NWTC says it is), a speech code that prohibits it would result in public university campuses that look very different than the all those which actually exist and be unconstitutionally overbroad. In *Miller ex rel. Miller v. Penn Manor School Dist.*, 588 F. Supp. 2d 606 (E.D. Pa. 2008), the court struck down a school district's policy banning "anything that is a distraction" because it did "not adequately put students

21

on notice of what standard of conduct for which they are held accountable." The exact same would be true regarding NWTC's Policy prohibition on "acts that are disruptive to the normal operations of the College."

NWTC contends that Ms. Olsen's conduct constituted "disturb[ing]" a "learning environment." (*Id.* at ¶47.) The Policy does not refer to a *learning environment*; it refers to disruption to the "operations of the College" or to "classes" or to "College business." (*Id.* at ¶61.) Ms. Olsen never handed out Valentines in a classroom that was in session or in the library or in other places dedicated to studying. (*Id.* at ¶48.) In fact, Ms. Olsen handed out many of her Valentines that day in the Student Center. (*Id.* at ¶71.) Given that students gather there for a variety of reasons, it would be a huge stretch to consider the Student Center to be a "learning environment" in which silence and isolation must be enforced. According to NWTC's view, its policy means that any place on NWTC's campus where students might be studying, such as in the coffee shop or under a tree, would potentially be considered a learning environment and therefore off-limits to being "disturbed" or "disrupted." Apparently, silence is commanded in the coffee shop if anyone is reading there. Such a contention cannot be taken seriously.

NWTC attempts, in response to discovery, to explain why handing someone in a public gathering space a piece of paper is disruptive belies the overbreadth of its policy. It says that the security video (referenced above at page 5) "shows the plaintiff approaching two students who were studying outside the General Studies Office, talking with them, and handing them Valentine's Day cards" and that by doing so "the plaintiff disturbed their learning environment." (PPFF ¶47.) There are multiple problems with this position. NWTC is unable to identify these two people and does not know they are students. (PPFF ¶50.) It does not know that they were "studying." They just as easily could have been talking with each other, reading the news, or checking emails. In

22

fact, a close viewing of the video shows that the male individual was actually starting to pack up a backpack *before* Ms. Olsen arrived and simply continued packing while she was there. The female individual appears to be looking at the male packing up and then starts packing up herself. Neither can be observed "studying." The two individuals were in a hallway. Other people walk by them during the approximately one-minute video. It is difficult to characterize a hallway as a "learning environment" in which spontaneous communication must be banned. Polly Olsen interacted with these two individuals for *six seconds*. This is as close to saying "Good morning" as the situation can get. That cannot be called "disruptive" and still have the word "disruptive" mean anything from a constitutional standpoint.

More fundamentally, while the Policy may legitimately bar conduct that is disruptive to the "operations of the College," to interpret that part of the policy to include what Ms. Olsen did as shown in the video renders the policy unconstitutionally vague and overbroad. Moreover, while NWTC has only challenged Ms. Olsen's behavior in the area around the General Studies Office, nothing in the Policy provides any clarity or confidence for Ms. Olsen (or other students) with respect to the question of whether her actions in other areas – the entrance area, the other hallways in the Student Center, the Buzz, the area around AJ Reed's office – were permitted, or not.

The vagueness and overbreadth of the Policy chills the speech and expression of Ms. Olsen and other students because it does not provide sufficient clarity to know what is and is not permitted, or for determining what speech and expression is limited to the public assembly area, and because it potentially prohibits a huge swath of protected speech.[8]

## IV.  EVEN IF THE PUBLIC ASSEMBLY POLICY IS FACIALLY CONSTITUTIONAL, NWTC'S APPLICATION OF ITS VAGUE AND OVERBROAD POLICY TO MS. OLSEN'S CONDUCT VIOLATED HER FIRST AMENDMENT RIGHTS (CLAIM IV)

---

[8] These are by no means the only vague terms in the Public Assembly Policy, but they are the ones most relevant to Ms. Olsen's circumstances.

23

The nature of Ms. Olsen's expressive conduct is clear and undisputed. She was handing out religiously-themed Valentines on Valentine's Day on NWTC's campus. NWTC's position is also clear and undisputed, as expressed by NWTC's own counsel:

> It is clear that NWTC's Public Assembly Policy does not violate the First Amendment. It follows, then that NWTC's simple refusal to allow Ms. Olson to conduct expressive activities inconsistent with the policy did not violate her constitutional rights.

(PPFF ¶55.)

NWTC has indicated that Ms. Olsen's expressive activity was impermissible for three reasons. First, NWTC suggests Ms. Olsen was soliciting. (*Id.* ¶73.) Second, NWTC claims that Ms. Olsen's actions in the area of the General Studies Office Area disturbed the learning environment (*Id.*) Third, NWTC claims that Ms. Olsen entered an area not open to students without permission or prior authorization. (*Id.*) None of these assertions are supported by the record.

**A. Ms. Olsen Was Not Soliciting.**

Ms. Olsen did not "solicit" any action on the part of any student or person. (PPFF ¶42.) She simply handed out Valentines. She did not force them on any person who did not wish to take one or entreat anyone who declined to take one to accept it. (*Id.*)

In discovery, Ms. Olsen asked NWTC to admit that it has "no evidence that Ms. Olsen was soliciting on the NWTC campus on February 14, 2018." (PPFF ¶43.) NWTC refused, saying that the video shows her approaching the two individuals outside the General Studies Office, speaking to them, and handing them Valentine's Day cards and that maybe that was "solicitation" in some form. (*Id.*) In other words, for NWTC, solicitation means saying something to someone and/or freely offering them a Valentine on Valentine's day. The Merriam-Webster online dictionary

defines "solicit" in part as follows: "to make petition to: ENTREAT"; "to approach with a request or plea"; "to urge (something, such as one's cause) strongly." *Solicit*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/solicit (last visited January 6, 2019). Under none of these definitions do Ms. Olsen's actions constitute soliciting. Rather than requesting or urging, Ms. Olsen was gratuitously offering Valentines free of charge.

### B. Ms. Olsen Did Not Disturb a Learning Environment.[9]

In short, NWTC's contention is that when Ms. Olsen handed Valentines to two individuals sitting at tables in the hallway outside of the General Studies Office area she was disrupting a learning environment. But NWTC has no evidentiary facts that would establish that the two individuals were students, or that they were studying, or that they were disrupted by Ms. Olsen. Ms. Olsen sought further information from NWTC in discovery and received nothing except the video. NWTC cannot now bring forth facts that it withheld in discovery in order to contest Ms. Olsen's motion for summary judgment.

### C. Ms. Olsen Did Not Access Any Areas within the General Studies Office That Were Off-Limits to Students.

Although the Public Assembly Policy is not limited to "restricted" areas (to the contrary, it applies everywhere), NWTC asserts that Ms. Olsen violated the Public Assembly Policy because she allegedly "without invitation, entered into restricted areas of the General Studies Office, which are restricted due to the presence of confidential student information and the probability that confidential student issues are being reviewed or discussed by and/or between employees and/or students." (PPFF ¶29.) First, there is nothing in the Public Assembly Policy regarding students visiting anyone's office. There may be a social contract of some type that precludes entering a

---

[9] As discussed above, the Policy does not apply to "learning environments."

person's office without knocking or in a truly private setting it might amount to trespassing but it is not a violation of NWTC's Public Assembly Policy.

Second, the offices are not actually "restricted" in any way. The General Studies Office area contained no signage or other indication of restricted access for any area within the office. (*Id.* ¶32.) In discovery, Ms. Olsen asked NWTC to produce copies of any such signs if they exist and the response was that there were no such signs. (*Id.* ¶33.) Ms. Olsen had freely walked through the same area on numerous previous occasions without incident and without anyone telling her she was unwelcome or otherwise in a prohibited or restricted area. (*Id.* ¶30.) She has seen numerous other students do the same thing. (*Id.*)

Third, before visiting Angela's or Cassie's offices in the General Studies Office, Ms. Olsen had stopped at the reception desk, handed the three people sitting there Valentines and expressed her intent to visit the offices of Angela and Cassie. (PPFF at ¶24.) The receptionist remarked that she thought it was a very nice gesture. (*Id.*) None of the three individuals behind the reception desk indicated any concern or objection to her going to Angela's or Cassie's offices or to any other individual offices within General Studies. (*Id.*)

Fourth, Ms. Olsen knew Angela and Cassie personally and had been in both of their offices in the past. (PPFF ¶30.) Based on past experience and general practice at NWTC, Ms. Olsen understood that she was permitted to visit the area without an appointment or advance announcement. (*Id.*) It is not as though Ms. Olsen rifled through the contents of the offices or even remained at each office for more than a few seconds; she simply dropped a Valentine on the desk and moved on. *Cf., e.g.*, *Florida v. Jardines*, 569 U.S. 1, 7-8 (2013) (explaining that "a police officer not armed with a warrant may approach a home and knock" though in "a constitutionally protected area" because of the "implicit license" in American culture that authorizes such activity

by any citizen).

Fifth, NWTC may point to the provision in the Policy that says "acts disruptive to the normal operations of the College . . . will not be tolerated." (PPFF ¶61.) But NWTC cannot point to any evidentiary facts that relate to that concern. The only office Ms. Olsen is actually seen entering on the video is Angela's office which she does immediately after handing Valentines to the four individuals standing in the reception area. Although the view is obstructed, if viewed closely the video shows that Ms. Olsen is only in that office for about 3-4 seconds. That is because Angela was not present and Ms. Olsen simply left a Valentine on her desk. (*Id.* ¶26.) Cassie was present in her office but Ms. Olsen states she was welcomed in Cassie's office and estimates that she was only there for about 10-15 seconds. (*Id.* ¶27.)

Nor has NWTC set forth facts in response to Ms. Olsen's discovery requests or in its letter from its counsel that there were, in fact, any confidential student records in view in any of the offices which Ms. Olsen visited. Thus, there is zero evidence to support an argument that she disrupted the normal operations of the College.

## V. DEFENDANTS JANDRIN AND HAGEL VIOLATED MS. OLSEN'S RIGHT TO FREEDOM OF SPEECH AND EXPRESSION BY RESTRICTING HER SPEECH AND EXPRESSION ON THE BASIS OF ITS CONTENT (CLAIM V)

Finally, Defendants Jandrin and Hagel unconstitutionally restricted Ms. Olsen's expressive activity on the basis of its content – the religious nature of Ms. Olsen's Valentines.

In traditional or designated public forums, "restrictions based on content must satisfy strict scrutiny." *Minnesota Voters*, 138 S. Ct. at 1885. This means that such restrictions "must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City, Utah*, 555 U.S. at 469. Even in non-public forums, restrictions may not be based on viewpoint. *See, e.g.*, *Minnesota Voters*, 138 S. Ct. at 1885.

27

The Valentine's Day cards Ms. Olsen handed out on February 14, 2018, were heart-shaped, on red paper, religiously-themed, and said things like "You are special! 1 John 4:11," "God is Love! 1 John 4:16," "Jesus Loves [Y]ou! Romans 5:8," and "[Y]ou are Loved and Cared for! 1 Peter 5:7." (PPFF ¶9.) The evidence in the record suggests that it was this religious content that led to the current controversy.

The Security Report completed by NWTC Security expressly states that the complaint to which they responded was of a female student "passing out Valentine's Day cards with bible references on the cards" which it characterized as "[s]uspicious." (*Id.* at ¶38.) After learning of this "suspicious" speech, Defendant Jandrin instructed Defendant Hagel to attempt to locate the student and if he located her "that he should bring her to the security office." (*Id.*) Defendant Hagel complied.

Mr. Jandrin then watched the video of what occurred in the area of the General Studies office (the same video that is in the record) and determined that Ms. Olsen's distribution of Valentines was problematic. (*Id.* at ¶39.) According to the Security Report, he told Ms. Olsen that "some people" may consider her actions soliciting or "*find the message written on the card offensive.*" (*Id.* at ¶46 (emphasis added.)) But Defendant Jandrin had no basis to reach either conclusion. He could not hear her and, thus, could not say that she was soliciting in her six-second interaction with the two individuals in the hallway or anyone else with whom she interacted. He could not conclude that "some people" could find the message to be offensive without making a content-based judgment, i.e., that any Valentine's Day card that contained any biblical reference could be considered offensive.

Although Defendants Jandrin and Hagel deny that any content-based discrimination occurred, the undisputed facts show otherwise. Based upon their own report, their actions were

based on the religious content of Ms. Olsen's Valentine's Day cards. Moreover, NWTC has admitted in discovery that the **only** violation of the Public Assembly Policy that they investigated from January 1, 2017 to the present is the complaint against Ms. Olsen. (PPFF ¶72.) It is, of course, possible that no other student at NWTC handed out Valentines on Valentine's Day or handed out any other literature on campus in the last two years but that is a proposition that is hard to credit. What is known, however, is that the only violation of the Public Assembly Policy that NWTC has investigated and sanctioned is Ms. Olsen's handing out religiously-themed Valentines on February 14, 2018.

NWTC is unable to put forth any interest, much less a compelling one, that justifies restricting religious speech – but not other types of speech – under these circumstances. The restriction thus fails strict scrutiny. *See, e.g.*, *Widmar*, 454 U.S. at 277 (university could not open a forum to student groups and then "enforce a content-based exclusion of religious speech"); *Reed v. Town of Gilbert, Ariz.*, ___ U.S. ___ 135 S. Ct. 2218 (2015) (town code imposing stricter restrictions on signs directing the public to meetings of nonprofit groups than other signs constituted invalid content-based regulation).

Defendants Jandrin and Hagel's actions in suppressing Ms. Olsen's freedom of speech and expression in handing out religiously-themed Valentine's Day cards based on the religious content of the cards violated her right to freedom of speech and expression.

## CONCLUSION

For the above reasons, Ms. Olsen asks the Court to enter summary judgment in her favor and declare that NWTC deprived Ms. Olsen of her First Amendment right of freedom of speech and expression, in violation of 42 U.S.C. § 1983. Ms. Olsen requests that the Court declare that the NWTC Public Assembly Policy is unconstitutional on its face and as applied to Ms. Olsen and

that Defendants Jardin and Hagel discriminated against her by restricting her First Amendment right of freedom of speech and expression based on the content of that speech and expression.

Submitted this 12th day of February, 2019.

WISCONSIN INSTITUTE FOR LAW & LIBERTY,
Attorneys for Plaintiff

/S/ RICHARD M. ESENBERG
Richard M. Esenberg, WI Bar No. 1005622
414-727-6367; rick@will-law.org
Anthony F. LoCoco, WI Bar No. 1101773
414-727-7419; alococo@will-law.org
MAILING ADDRESS:
1139 East Knapp Street
Milwaukee, WI 53202-2828
414-727-9455
FAX: 414-727-6385

30