# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

POLLY OLSEN,

        Plaintiff,

v.                                             Case No. 18-C-1366

H. JEFFREY RAFN, et al.,

        Defendants.

## DECISION AND ORDER

      Most Americans have had the experience as young children attending school of giving to and receiving from their classmates Valentine's Day cards on Valentine's Day, which falls on February 14th. Plaintiff Polly Olsen's attempt to resurrect that experience as an adult student at Northeast Wisconsin Technical College (NWTC) is the subject of this lawsuit. Olsen handed out homemade, heart-shaped Valentines on Valentine's Day in 2018 on the Green Bay Campus of NWTC. Her cut-out Valentines contained short messages such as "Jesus Loves You!," "You are Loved!," and "You are never alone!" with accompanying citations to the Bible. After handing out about two dozen Valentines in several areas of campus, a security officer stopped Olsen, informed her that she was violating NWTC's Public Assembly Policy, and prohibited her from handing out more Valentines. Olsen filed this action for declaratory and injunctive relief under 42 U.S.C. § 1983 to vindicate her First Amendment rights, as applied to the States through the Fourteenth Amendment. Olsen claims that in prohibiting her from handing out Valentines to friends, fellow students, and staff at the college, NWTC violated her rights. She raises both facial and as-applied challenges to NWTC's Public Assembly Policy which the College claims it was enforcing and seeks

nominal damages, together with declaratory and injunctive relief. This court has jurisdiction over this action under 28 U.S.C. § 1331. After commencement of this action, NWTC repealed and replaced the Public Assembly Policy, and now claims this case fails to present a justiciable Article III case or controversy. Presently before the court is Olsen's motion for summary judgment. For the reasons stated below, Olsen's motion will be granted.

## BACKGROUND

Polly Olsen is a student at NWTC who identifies as Christian. Early in her life, Olsen and her mother began making religiously themed Valentines and handing them out on Valentine's Day to friends, acquaintances, and strangers in a variety of places, including nursing homes, hospitals, and the neighborhood in which they lived. They viewed their actions in this regard as an attempt to spread Christian love and fellowship on Valentine's Day. Since her mother died in 2013, Olsen has sought to continue the tradition of making and passing out religiously themed Valentines on Valentine's Day.

On the morning of February 14, 2018, Olsen handed out Valentines in several areas of NWTC's Green Bay campus. Olsen hand-made the heart-shaped Valentines, which were approximately three inches by three inches in diameter, and contained messages such as "Jesus Loves You! Romans 5:8," "You have a PURPOSE! Jer. 19:11," "You are Loved! 1 John 4:19," "God is Love! 1 John 4:16," and "You are never alone! 1 Peter 2:21." Olsen Decl. Ex. A, Dkt. No. 14-1 (copy attached hereto). Olsen entered the College of Business building and handed out Valentines to several individuals she encountered in the entrance area and nearby hallways before proceeding onward. She then entered the area where the offices of the College of Business are located and gave Valentines to no more than five personnel, including the receptionist. There were no signs in the office area indicating that students needed permission to access certain areas.

2

Olsen next walked to a coffee shop named "The Buzz," an area where students congregate that is located across from the College of Business, and handed Valentines to a few students. She then went to the Academic Skills office to hand a Valentine to her friend AJ Reed, who told her that his wife, Casandra Reed, also Olsen's friend, was in the General Studies office. Olsen left to give Casandra a Valentine. On her way to the General Studies office, Olsen handed Valentines to two students sitting at tables in the hallway, at least one of whom appeared to be packing up his materials. Upon reaching the General Studies office, Olsen handed Valentines to three people sitting behind the reception desk. She asked a receptionist if Angela Blasier (who Olsen knew personally) was in her office. After being told that Blasier was out of the office, Olsen told the receptionist that she was going to leave a Valentine on Blasier's desk and give one to Casandra.

She then walked to Blasier and Casandra's offices. None of the three individuals behind the reception desk said or did anything to indicate that she was not permitted to proceed to Blasier or Casandra's offices. On the way to these offices, Olsen handed Valentines to four people who were congregating and socializing in the reception area. She then left a Valentine on Blasier's desk, handed a Valentine to Casandra in her cubicle office, and dropped off Valentines in the cubicles of a few other individuals. She dropped off these Valentines in view of school employees and explained what she was doing. Her practice of visiting Blasier and Casandra's offices was consistent with her previous practice of visiting employees at NWTC for both personal and school-related reasons. She had freely walked through the General Studies office in the past without incident and had seen numerous other students do the same thing. She understood based on past experience and general practice at NWTC that she was permitted to visit the area without an appointment or advance announcement.

3

Shortly after leaving the area of the General Studies office, someone phoned the NWTC Security office to complain. According to the security incident report, the complaint was that a female student was in the General Studies office and "passing out Valentine's Day cards with bible references on the cards." LoCoco Decl. Ex. D, Dkt. No. 15-4 at 1. Security Supervisor Mike Jandrin, who authored the incident report, identified the incident type as "[s]uspicious activity and/or person." *Id.* After receiving the complaint, Security Officer Jesse Hagel was dispatched to go to the General Studies office, locate the individual, and, if able to locate her, bring her to the NWTC Security Office. After Hagel left the security office, Jandrin accessed the internal security video.

After leaving the General Studies office through the back door, Olsen handed out Valentines in additional areas until Hagel stopped her. Hagel told Olsen that her conduct constituted "solicitation" and was in violation of NWTC's Public Assembly Policy, and that she was prohibited from handing out Valentines. Olsen estimates that, in total, she delivered approximately thirty Valentines in various areas of the central complex of the campus' interconnected buildings. At no time did Olsen sell Valentines, ask anyone for anything as a condition for accepting the Valentines, or force the Valentines on any person who did not wish to take one or entreat anyone who declined to accept it. Hagel escorted Olsen to the security office, where she spoke with Jandrin.

Upon Olsen's arrival in the security office, Jandrin told her that some people could find the message on her Valentines offensive or could consider her actions as solicitation. Olsen showed Jandrin some of her Valentines. Jandrin informed Olsen that the reason for their conversation was her possibly "disturbing the learning environment, and walking into an area that is restricted to students without being invited or announced." *Id.* at 2. The General Studies office contained no

4

signage or other indication of restricted access, although the office had doors and a reception desk located at its entrance. In response to Jandrin's comments, Olsen told him that he was violating her right to free speech and discriminating against her based on her religious beliefs. Olsen subsequently filed a complaint with NWTC and attended a meeting, with her counsel, with two NWTC representatives, and NWTC's counsel. Counsel exchanged letters, but Olsen's complaint was not resolved. NWTC's counsel maintained that the Public Assembly Policy was constitutional and that NWTC's enforcement of the Policy on February 14, 2018 was lawful.

Unable to resolve her dispute with NWTC directly, Olsen filed this action against the NWTC District Board and its members, H. Jeffrey Rafn and Colleen Simpson, respectively the President and Vice President of Student Services at NWTC, as well as Security Coordinator Randy Schultz, Jandrin, and Hagel (collectively referred to as NWTC). Olsen has sued all defendants in their official capacities, with the exception of Schultz, Jandrin, and Hagel, who are also sued in their personal capacities, asserting claims for nominal damages, declaratory and injunctive relief, and attorney's fees. Olsen has raised facial and as-applied challenges to the constitutionality of NWTC's Public Assembly Policy under the First and Fourteenth Amendments to the Constitution.

On February 25, 2019, after Olsen moved for summary judgment and before NWTC filed its materials in opposition, the NWTC Executive Leadership Team (ELT), which is tasked with making various policy and operational decisions delegated to it by the NWTC Board of Trustees, repealed the Public Assembly Policy. Repeal of the Policy had been vetted by the ELT and other NWTC representatives throughout 2018 and early 2019. The ELT then promulgated a new policy entitled "Freedom of Speech, Expression, and Public Assembly Policy." LoCoco (2nd) Decl. Ex. A, Dkt. No. 23-1.

**ANALYSIS**

**A. Mootness**

NWTC first argues that Olsen's case is moot because NWTC changed the policy under which she was prevented from handing out Valentines. A claim is moot when it no longer involves an actual and ongoing controversy. A question of mootness arises when a challenged statute, ordinance, or policy is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief.

> The complete repeal of a challenged statute naturally renders a request for an injunction against application of that statute moot. *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. Hobart*, 864 F.2d 551, 553 (7th Cir. 1988); *Goldschmidt v. Patchett*, 686 F.2d 582, 584 (7th Cir. 1982). So does an amendment that clearly rectifies the statute's alleged defects. *Penny Saver Publications v. Hazel Crest*, 905 F.2d 150, 153 (7th Cir. 1990); *Thomas v. Fiedler*, 884 F.2d 990, 995 (7th Cir. 1989). However, when an intervening amendment provides no assurance that the complained-of conduct will cease, the case is not moot. *Associated General Contractors*, 508 U.S. at —, 113 S.Ct. at 2301. In other words, if the injury of which a plaintiff complains continues even under the amended statute, then the possible issuance of an injunction promises a measure of relief, and a court may act.

*Rembert v. Sheahan*, 62 F.3d 937, 940–41 (7th Cir. 1995). As the Supreme Court recently noted, "voluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (alteration in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)).

NWTC's new policy does not render this case moot. It is clear from its new policy, as well as its defense of its actions under its old policy, that NWTC has not and has no intention of ceasing the very behavior that gave rise to Olsen's lawsuit. To the contrary, its new policy appears to have been enacted with the clear goal of more effectively arming NWTC to accomplish the same result:

6

preventing Olsen and others from what the policy now calls "expressive activity" outside of the small number of designated "public assembly areas" within the boundaries of the campus. In other words, it remains NWTC's position that it may lawfully prohibit students, such as Olsen, from freely handing out small pieces of paper such as Olsen's Valentines with biblical verses or other messages written on them to friends, fellow students, and staff at the College who accept them. Since Olsen remains a student at NWTC and intends to continue her practice of handing out her home-made, heart-shaped Valentines on Valentines Day to those willing to accept them, her claims for declaratory and injunctive relief are not moot.

**B. Freedom of Speech**

The First Amendment to the United States Constitution states in part that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment applies to States through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652 (1925), and is fully binding on state colleges like NWTC. *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."). Indeed, the Court has recognized that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Id.* at 268 n.5 (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972), and *Cox v. Louisiana*, 379 U.S. 536 (1965)). "The college classroom with its surrounding environs is peculiarly 'the marketplace of ideas.' " *Healy v. James*, 408 U.S. 169, 180 (1972).

There can be no doubt that in handing out her home-made Valentines to her fellow students, friends, and staff at NWTC, Olsen was engaged in a constitutionally protected form of expression. Olsen's conduct bears some resemblance to "handbilling" which has been defined as "the practice

7

of offering written material—be it handbills, pamphlets, tracts, advertisements, booklets, notices or other information—to individuals in public places for their acceptance or rejection." *Horina v. Granite City*, 538 F.3d 624, 631 (7th Cir. 2008). And "[a]s the United States Supreme Court recognized nearly 70 years ago in the its decision *Lovell v. Griffin*, handbilling is both a method of communication that has a long and venerable history that predates the birth of this nation, and is a form of speech that is protected under the First and Fourteenth Amendments." *Id.* (citing *Lovell*, 303 U.S. 444, 452 (1938) (noting that handbills have "been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest")).

As with all forms of protected speech, however, "the right to handbill is not absolute." *Id.* (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 809–10 (1984)). Local governments and governmental bodies may enact reasonable restrictions on handbilling consistent with the First Amendment. "Specifically, so long as the restrictions are 'content neutral'—that is, unrelated to the content of the speech expressed in the handbills—governments may regulate the time, place, and manner in which the activity of handbilling itself occurs." *Id.* (citing *Weinberg v. City of Chicago*, 310 F.3d 1029, 1036–37 (7th Cir. 2002)). "And under this 'time, place, and manner analysis,' such restrictions can survive scrutiny only if the government can show that they (1) serve a substantial government interest; (2) are narrowly tailored to advance that interest; and (3) leave open ample alternative channels of communication to allow the individual handbilling other ways to convey his or her message." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and *Weinberg*, 310 F.3d at 1036–37).

Both parties analyze NWTC's right to prohibit Olsen's conduct under the public-forum doctrine. The public-forum doctrine recognizes "three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v.*

8

*NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). The traditional public forum consists of "government property that has traditionally been available for public expression," such as public streets and parks. *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992). The designated public forum consists of public property "that the State has opened for expressive activity by part or all of the public." *Id.* at 678. "[A]ll remaining public property" falls into the third category, the nonpublic forum. *Id.* at 678–79. With respect to a traditional public forum and a designated public forum, "the government may not prohibit all communicative activity," may only enforce content-based restrictions when it shows "that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," and "may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983). Regulations concerning nonpublic fora, however, face less daunting scrutiny: They "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lee*, 505 U.S. at 679.

Applying public forum doctrine to the facts of this case, NWTC argues that under its "Public Assembly" policy then in effect, and under its newly enacted "Freedom of Speech, Expression, and Public Assembly" policy, its entire campus is a nonpublic forum, except for the designated "Public Assembly Areas." Because the areas where Olsen was handing out her Valentines were not within the designated "Public Assembly Areas," NWTC argues that its Security Officer acted lawfully in prohibiting Olsen from handing out her Valentines. Defs.' Mem. in Resp. to Mot. for S.J., Dkt. No. 17, at 12–15.

9

Olsen, on the other hand, challenges NWTC's attempt to confine expressive activity to its designated public assembly areas and argues that the areas in which she distributed her Valentines were either traditional or designated public forums. Pl.'s Mem. in Support of Mot. for S.J., Dkt. No. 12, at 10–13. She notes that the areas NTWC formally designated as public assembly areas under the policy in effect at the time of the incident amounted to only 480 square feet of a 145 acre campus with 1.073 million square feet of building space and was located outside the Main Entrance and the Student Center Entrance. Moreover, in order to use the dedicated public assembly area under the old policy, one had to reserve it by filing an application with the NTWC Security Office. NWTC's policy limiting constitutionally protected expression to such a small area, Olsen contends, and then requiring any speaker who chooses to exercise his right to speak to first obtain a permit, is overbroad and unconstitutional. Because she violated no reasonable time, place, or manner limitation and NWTC had no compelling interest in suppressing the content of her speech, Olsen argues that NWTC Security violated her First Amendment rights by prohibiting her from giving Valentines to those she encountered.

As an initial matter, Olsen did not need a public forum in order to lawfully convey her messages. While Olsen's conduct bears some similarity to handbilling, it was not handbilling in the traditional sense. Traditional handbilling refers to handing out the same written material to members of the public in general, such as a pamphlet, advertisement, booklet, or campaign material. Each of the Valentines Olsen handed out, however, had a different message directed not to the public in general but to the person to whom she gave the Valentine. The messages included phrases like "You are loved and cared for! 1 Peter 5:7"; "What is real love? Romans 10:9–10"; "You are special! 1 John 4:11"; "You have a purpose! Jer. 29:11." In other words, Olsen was not conveying the same message to the general public; she was saying something different to each person

10

individually. And in order to do so, Olsen was not seeking use of a public forum, traditional or otherwise. She was communicating with each person individually.

A forum is defined as "a public meeting place for open discussion." MERRIAN-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999). Olsen was not trying to hold a public meeting for open discussion of her opinions or beliefs. She was not convening a political rally or religious revival meeting. Instead, she simply sought to convey her messages of joy and love commemorating the day to her friends and others she encountered individually as she walked through the commons and hallways, and visited her friends in their offices. Had she done so in a manner that was unruly or disruptive to the goals of the College, or if the messages she sought to convey were obscene or indecent, NTWC would have been justified in stopping her. But Olsen did none of these things. According to the complaint, "She simply handed Valentines to approximately ten persons. She did not force them on any person who did not wish to take one or entreat anyone who declined to take one to accept it." Compl., Dkt. No. 1, ¶ 103.

Although NWTC makes much of the fact that Olsen went into the General Studies office to give a Valentine to her friend Casandra, there is no evidence that this was a restricted area and it is undisputed that Olsen had a practice of visiting employees at NWTC who were friends for both personal and school-related reasons. The fact that one person anonymously complained about the message does not rob her of her right to convey her message to others who willingly accepted it. No one, including the complainer, was forced to accept Olsen's offer of a Valentine; he or she could have simply said "no thank you" or promptly placed it in a trash receptacle. NWTC had no more right to prevent her from handing out individual Valentines than it did to stop her from wishing each individual to have a "good morning and a blessed day."

11

NWTC argues that this case is governed by *Anderson v. Milwaukee County*, 433 F.3d 975 (7th Cir. 2006), where the court held that a transit authority could lawfully prohibit a passenger from handing out religious literature to other passengers on a city bus. In *Anderson*, the court concluded that a city bus was a nonpublic forum and, thus, any limitation of the plaintiff's First Amendment rights needed only to be reasonable. *Id.* at 979. The court found that the limitation in that case clearly met that standard:

> Here, the restriction is clearly reasonable. Bus passengers are a captive audience. While riding on the bus, many passengers have an interest in avoiding unwelcome communications. It is reasonable for the bus company to attempt to ensure their comfort. In *Lehman*, the Court concluded that a city was entitled to protect unwilling viewers against intrusive advertising on its buses in order to provide rapid, convenient, pleasant, and inexpensive public transportation for them. It is also reasonable to wish to avoid disagreements among passengers which the distribution of literature might inspire. Furthermore, the bus company has an interest in passenger safety. The company expresses concern that a driver could be distracted by literature distribution and that abandoned literature can cause a safety hazard and certainly a littering problem. Given the nature of the forum, a ban on the distribution of literature on buses passes constitutional muster.

*Id.* at 980. But this case does not involve a person handing out religious books to a captive audience of commuters and sharing her faith with those sitting next to her, whether voluntarily or not, while the bus driver tries to safely navigate through traffic and make his appointed stops. Olsen gave heart-shaped Valentines to those who accepted them as she walked around a college campus. The two cases are not similar, and *Anderson* is not controlling.

NWTC also cites *Gilles v. Blanchard*, 477 F.3d 466 (7th Cir. 2007), where the court held that a non-student itinerant preacher did not have a First Amendment right to preach on the lawn outside the library of Vincennes University in Indiana. The court rejected the preacher's claim but declined to utilize the forum analysis in doing so. It found the issue more simply posed as "whether

12

a university should be able to bar uninvited speakers under a policy that by decentralizing the invitation process assures nondiscrimination, and a reasonable diversity of viewpoints consistent with the university's autonomy and right of self-governance." *Id.* at 474. The court concluded that the university could constitutionally do so. *Id.* Here, of course, Olsen is a student at NWTC, not a trespasser, and she was handing out Valentines to individuals who accepted them, not publicly preaching to an assembly. For these reasons, *Gilles* is also unpersuasive.

To the extent NTWC would construe its new policy to allow such a prohibition, it is unconstitutional. Under its new "Freedom of Speech, Expression, and Public Assembly Policy," NWTC seeks to limit what it calls "expressive activity" to four internal and five external designated "Public Assembly Areas." LoCoco (2nd) Decl., [*see* p. 6-consistency] Ex. B, Dkt. No. 23-2. The Policy defines "expressive activity" to mean:

> demonstrations, picketing, vigils, rallies, performances, petitioning, gathering of signatures, distribution of literature, and other forms of outward communication. Expressive Activity does not include social, random, or other everyday communication.

Dkt. No. 23-1 at 1. Although the new policy has expanded the number of designated Public Assembly Areas in which NWTC will permit "assembly and/or expressive activity," the total area still represents only a minute part of the campus. At the same time, the definition of expressive conduct NWTC claims is prohibited in all other areas is so broad as to render its policy unconstitutionally vague. The main problem lies in the phrases "distribution of literature" and "other forms of outward communication." Is a simple note "literature"? And what form of communication with another person is not outward? The attempt to limit the sheer breadth of "expressive activity" the Policy seeks to control by excluding from its definition "social, random,

or other everyday communication" does not help since the determination of whether the exception applies necessarily requires content-based considerations. The policy reflects a view that, as one court explained, "would allow the [college] to restrict the speech of all students to limited topics, subject only to a reasonableness review." *Univ. of Cincinnati Chapter of Young Americans For Liberty v. Williams*, No. 12-cv-155, 2012 WL 2160969, *5 (S.D. Ohio June 12, 2012). "Such a theory is anathema to the nature of a [college], which is 'peculiarly the marketplace of ideas' and runs contrary to the Supreme Court's holding that 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Id.* (quoting *Healy*, 408 U.S. at 180).

## CONCLUSION

For the foregoing reasons, Olsen's motion for summary judgment (Dkt. No. 11) is **GRANTED**. Defendants' motion for leave to file sur-reply (Dkt. No. 25) is **GRANTED**. The Clerk is directed to enter judgment in favor of the plaintiff and against the defendants for nominal damages in the amount of one (1) dollar, declaring that the defendants violated the plaintiff's First Amendment rights by prohibiting her from handing out Valentines on February 14, 2018, and enjoining the defendants from applying NWTC's "Freedom of Speech, Expression, and Public Assembly Policy " so as to prohibit students from offering other students Valentines or similar notes.

**SO ORDERED** at Green Bay, Wisconsin this ___13th___ day of September, 2019.

          s/ William C. Griesbach
          William C. Griesbach, Chief Judge
          United States District Court

